IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                                          No. 1:22-cr-00113-WJ

MARIO GOMEZ CALDERON,

      Defendant,

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

**THIS MATTER** is before the Court on the Defendant's Motion to Suppress the Results of an Unduly Suggestive Identification Procedure (**Doc. 42**). Having considered the written and oral arguments of counsel, the video exhibits and witness testimony admitted at the suppression hearing on December 5, 2022, as well as the applicable law, the Court concludes that even though the identification of Mr. Calderon was unnecessarily suggestive—which the United States concedes—the identification is still sufficiently reliable; therefore, Defendant's Motion (**Doc. 42**) is **DENIED**.

### BACKGROUND

Defendant Mario Gomez Calderon is charged with one count of Hobbs Act Robbery, under 18 U.S.C. § 1951, for allegedly committing an armed robbery at the Comanche Fuel Stop—a gas station convenience store. Mr. Calderon is alleged to have stolen merchandise and cash from the register and to have been armed with a handgun. The alleged victim of this crime is the gas station store clerk, who is referred to by his initials, P.E. P.E. identified Mr. Calderon as the robber less than an hour after the robbery took place.

1

### A. The Robbery[1]

The alleged robbery took place at the Comanche Fuel Stop in Albuquerque, New Mexico, on the night of December 3, 2021. P.E. was the assistant manager and head cashier at the Comanche Fuel Stop and was on duty that night. According to P.E., at around 11:09 p.m., a man—the robber—entered the gas station convenience store. The robber entered the store wearing a disposable face mask but removed it before he interacted with P.E. The robber appeared to be under the influence of both drugs and alcohol—P.E. testified that the robber smelled of alcohol.

The robber asked for two bottles of Fireball liquor and three packs of Marlboro Red cigarettes. P.E. began ringing up the merchandise at the west checkout counter. P.E. testified the robber then said, "I'm robbing you; I have a gun." At first P.E. thought the robber was joking, but then the robber pulled out a gun.[2] After the robber pulled the gun, P.E. testified that P.E. told the robber to come over to the west checkout counter to keep everyone in the store safe. P.E. also testified that the robber told him, "I will shoot you" and "I am wanted for murder." The robber then demanded P.E. hand over the liquor, the cigarettes, and all the cash in P.E.'s register. The robber exited the store and got into a white four-door car. According to P.E., the robber was a passenger in the car—not the driver. The car was never located. The United States submitted video recordings of the gas station's surveillance footage during the robbery. The surveillance cameras caught brief, grainy footage of the robber entering the store, the robber demanding the store clerk hand over merchandise and cash, and the robber leaving the store. None of the videos show a gun. These videos—Govt.'s Ex. 6-8—were admitted into evidence at the suppression hearing.

---

[1] The facts are taken from P.E.'s testimony at the December 5, 2022, hearing and the Government's video exhibits admitted into evidence at the suppression hearing (Govt. Ex. 1-8).

[2] In the lapel camera footage, P.E. states the robber pulled a 9-millimeter handgun out of his pocket and had the gun in his hand but did not point it directly at P.E. *See* Govt. Exhibit 1 at 1:05-2:03. But at the suppression hearing, P.E. testified the robber had the firearm in the waistband of his pants and lifted his shirt to reveal it to P.E. Then, on cross, P.E. testified the robber initially pulled out a gun but then put it back in his waistband.

After the robbery, P.E. immediately called 911. Soon after that, Albuquerque Police Department ("APD") officers arrived. P.E. told the officers that the robber was a Hispanic male, 5'-5'5," in his late-30's to mid-40's, with tattoos on his eyebrows, and wearing a white shirt and blue jeans.[3] Later that night, P.E. again described the robber as between 5' and 5'5," weighing 250-260 lbs., bald, with tattoos over his eyebrows, with a bloodshot right eye, and wearing a white shirt and blue jeans.[4] At the suppression hearing, P.E. described the robber as a Latino male, 5'5"-5'6," 230-235 lbs., wearing a white shirt and blue jeans, with a bloodshot eye, tattoos over his eyes, and wearing a beanie hat.

### B.  The Identification of Mr. Calderon

Not long after the robbery, other APD officers were dispatched to the Intown Suites motel to deal with a domestic dispute. At the Intown Suites, officers encountered Mr. Calderon and thought he matched the description of the Comanche Fuel Stop robber. The Intown-Suites officers informed the Comanche-Fuel-Stop officers that they had a possible suspect.

Officer Eduardo Munoz was one of the officers at the Comanche Fuel Stop. Defendant attached a transcript of Officer Munoz's lapel camera footage to his motion to suppress. This lapel camera footage was also admitted into evidence at the December 5, 2022, hearing. The following conversation was captured by Officer Munoz's lapel camera:[5]

| | |
|---|---|
| **Officer Munoz**: | Hey bro, so we found someone matching the description, [inaudible]. Are you willing to do a field ID? |
| **P.E.:** | Yeah, bro, definitely |
| **Officer Munoz:** | So my partner's gonna come over here and take you out there, okay? So you could see if you could identify him. |

---

[3] *See* Govt. Exhibit 1 at 9:30.

[4] *See* Govt. Exhibit 5 at 3:55, 5:04, 5:16; 12:42.

[5] This interaction begins at 0:33 of Government's Exhibit 3.

| | |
|---|---|
| **P.E.:** | That's fine. |
| … | |
| **Officer Munoz:** | We don't have a car, man, but we have . . . He matches the description, bro. Tattoo over his eyes, 5'5", heavy built, white t-shirt, blue jeans, so.[6] |

A couple minutes passed; P.E. and the officers talked while waiting for other officers to take P.E. to Intown Suites. While waiting, P.E. made the following statement:

| | |
|---|---|
| **P.E.:** | I'm gonna wait as long as it takes, besides you guys will get a positive ID from me.[7] |
| **Speaker 4:** | Hopefully it's him. |
| **P.E.:** | Oh, I'll be able to tell.[8] |
| **Officer Munoz:** | What's that? |
| **P.E.:** | He probably got dropped off. |
| **Officer Munoz:** | Yeah, I don't know all the details, my buddy just called me now, saying, "Hey, we have a guy that matches the description," you know, so it's worth a try. |
| **P.E.:** | It's how far though? |
| **Officer Munoz:** | It's not that far. |
| **Speaker 3:** | Tattoo over the eyes?[9] |
| **Officer Munoz:** | Yeah, he said he had tattoos on his face. |
| **P.E.:** | I'll identify him if it's him. |

A short time later, APD Officer Curtis Hoffman arrived at the Comanche Fuel Stop to pick up P.E. and run him by the Intown Suites, where officers were detaining Mr. Calderon. P.E. was

---

[6] The transcript attached to Defendant's motion reads, "tattoo on his eye"; however, in the video recording Officer Munoz appears to say, "over his eye."

[7] The transcript attached to Defendant's motion reads, "you guys will get a positive ID," but in the video P.E. appears to say, "you guys will get a positive ID from me." *See* Government's Exhibit 3 at 2:14.

[8] This statement by P.E. does not appear in the transcript Defendant attached to his motion, but it is clearly audible in the video recording.

[9] The transcript reads, "Tattoo over there." But based on the video recording it appears Speaker 3 says, "Tattoo over the eyes?"

4

taken to Intown Suites in the back of an APD patrol car driven by Officer Hoffman who was also wearing a lapel camera.[10]

The identification of Mr. Calderon took place in the middle of the night, less than an hour after the robbery. At the time of the identification, the Defendant was standing in the Intown Suites parking lot surrounded by uniformed police officers. P.E. testified the lighting in the parking lot was "decent." When P.E. identified the Defendant, the Defendant was wearing a hoodie sweatshirt over a white shirt and blue jeans. P.E. testified that when he identified the Defendant, the Defendant's hoodie was unzipped so that he could see the white shirt underneath. P.E. also testified that at the time of identification he was able to clearly see the tattoos over the Defendant's eyes and his bloodshot eye.

P.E. was in the back of an APD patrol car when he identified the Defendant. Although, P.E. originally testified on direct examination that he was about ten feet away from the Defendant at the time of the identification, on cross P.E. testified he was further away.[11] The identification occurred very quickly—P.E. testified he identified Defendant in "less than half a second." The identification was captured by Officer Hoffman's lapel camera:[12]

    **Officer Hoffman:**    Are you guys still on the same side and I can run him over there?
    **Officer (over radio):** Yeah, just drive onto the back of . . .
    **Officer Hoffman:**    10-4. All right, sir, you're going to be looking at the…

---

[10] Defendant attached a transcript of Officer Hoffman's lapel camera footage to his Motion to Suppress. The Government submitted the lapel camera footage as Government Exhibit 4, which was admitted at the suppression hearing. Although there is technically a video recording of P.E. identifying Mr. Calderon, Officer Hoffman's lapel camera is pointed at the steering wheel of the vehicle the whole time, so the video is in effect an audio recording of the identification.

[11] Defense counsel argued at the hearing that P.E. identified the Defendant from about twenty-five feet away. The Court will not consider counsel's argument as evidence, especially since defense counsel failed to request the Court take judicial notice of the distance between the witness box and the bar in the courtroom, which P.E. agreed, during cross, was the correct distance.

[12] Identification sequence begins at 8:40 of Government's Exhibit 4.

| | |
|---|---|
| **Officer (over radio):** | And also see if your witness can identify maybe one of the vehicles that was involved. It may be parked in the parking lot somewhere. |
| **Officer Hoffman:** | All right, so the male subject's going to be just up here and look in the parking lot and see if you recognize any of the cars. |
| … | |
| **P.E.:** | That's him. |
| **Officer Hoffman:** | That's him? |
| **P.E.:** | That's him. |
| **Officer Hoffman:** | [Inaudible] 727, that's a positive ID. |

When P.E. was asked at the suppression hearing how certain he was that Mr. Calderon was the robber when he identified him, P.E. responded "fairly certain." At the suppression hearing, P.E. again identified Mr. Calderon as the man who had robbed and threatened him at the Comanche Fuel Stop on December 3, 2021.

Mr. Calderon moves to suppress all evidence at trial derived from P.E.'s identification of him, including any evidence or reference to P.E.'s identification, and any in-court identification of Mr. Calderon by P.E. during trial. Defendant contends suppression is warranted because the identification procedure employed by APD was unduly suggestive and thus violated his constitutional right to due process and a fair trial. Defendant Calderon further contends that if the identification is not suppressed there would be a substantial likelihood of irreparable misidentification.

In response, the United States argues that even though the identification procedure was unnecessarily suggestive, P.E.'s identification of Mr. Calderon should not be suppressed because it is sufficiently reliable under the factors laid out in *Neil v. Biggers*, 409 U.S. 188 (1972), ("the *Biggers* factors") and considering the totality of the circumstances.

The Court held a hearing on Defendant's Motion to Suppress on December 5, 2022. At this hearing, P.E. testified on behalf of the United States. The United States also moved for the

6

admission of APD officer lapel camera video footage as well as surveillance footage. *See* Govt. Ex. 1-8. Defendant did not object, and the video exhibits were admitted into evidence for the purposes of the suppression hearing. At the hearing, the Court denied Defendant's Motion to Suppress because even though the identification of Mr. Calderon was unnecessarily suggestive, the *Biggers* factors weigh in favor of finding the identification sufficiently reliable.

## DISCUSSION

I.   **Law Governing Suppression of Identification**

To determine whether a pretrial identification procedure is constitutional, the Court applies a two-prong test: First, the Court examines "whether the procedure was unnecessarily suggestive." *United States v. Bredy*, 209 F.3d 1193, 1195 (10th Cir. 2000). If the Court finds the identification procedure was unnecessarily suggestive, the Court will then analyze "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Id.* (citation omitted). "[R]eliability is the linchpin for determining admissibility." *United States v. Thompson*, 524 F.3d 1126, 1135 (10th Cir. 2008) (citation omitted).

In *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), the Supreme Court set out five factors a Court should consider in determining whether an identification is reliable:

1. the opportunity of the witness to view the criminal at the time of the crime,
2. the witness' degree of attention,
3. the accuracy of the witness' prior description of the criminal,
4. the level of certainty demonstrated by the witness at the confrontation, and
5. the length of time between the crime and the confrontation.

"These factors must be weighed against 'the corruptive effect of a suggestive pre-trial identification procedure to determine whether the identification testimony should [be] suppressed.'" *Snow v. Sirmons*, 474 F.3d 693, 720 (10th Cir. 2007) (citation omitted). An identification should be suppressed if—considering these factors and the totality of the

circumstances—the Court determines there is "a very substantial likelihood of irreparable misidentification." *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)).[13] "Short of that point, such evidence is for the jury to weigh." *Snow*, 474 F.3d at 723 (citation omitted). As the Supreme Court has explained,

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Manson*, 432 U.S. at 116.

**I.     The USA concedes the identification of Mr. Calderon was unduly suggestive.**

Mr. Calderon first contends the identification procedure employed by APD was unnecessarily suggestive; the United States concedes this point, and with good reason. As the United States explains in its briefing, two factors compel a finding that the identification was unnecessarily suggestive: (1) by presenting Mr. Calderon as the only suspect for P.E. to identify, the APD officers conducted a showup[14]—a procedure that has been widely condemned for over fifty years; and (2) Officer Munoz coached the identification by telling P.E., prior to the showup, that officers had a suspect in custody who matched P.E.'s description of the robber.

---

[13] In their briefing, both parties articulate the test as whether the unduly suggestive identification created a "substantial likelihood of irreparable misidentification." While some Tenth Circuit cases do apply this test, the actual language the Supreme Court used—and that is reflected in other Tenth Circuit precedent—is "a *very* substantial likelihood of irreparable misidentification." *Biggers*, 409 U.S. at 198 (emphasis added); *see also Manson*, 432 U.S. at 116; *United States v. Curtis*, 344 F.3d 1057, 1062-63 (10th Cir. 2003); *Snow*, 474 F.3d at 720. *Cf. Bredy*, 209 F.3d at 1195 (explaining the test as whether an identification procedure created "a substantial likelihood of irreparable misidentification"); *United States v. Kamahele*, 748 F.3d 984, 1019 (10th Cir. 2014) (same). Here, the Court applies the higher standard—whether there is a "very substantial likelihood of irreparable misidentification"—however, even under the lower standard, the identification in this case should not be suppressed.

[14] "A 'showup' is a procedure where a single individual is exhibited to a witness and the witness is asked whether she can identify the individual as the perpetrator of the crime being investigated." *Stamps v. Miller*, 763 F. App'x 686, 689 n.2 (10th Cir. 2019) (citation omitted).

There is no dispute the identification of Mr. Calderon was unnecessarily suggestive. *See Stovall v. Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds by United States v. Johnson*, 457 U.S. 537, 102 (1982) ("The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned."); *United States v. Funches*, 84 F.3d 249, 254 (7th Cir. 1996) ("A show-up is inherently suggestive. . . ."); *Grubbs v. Hannigan*, 982 F.2d 1483, 1490 (10th Cir. 1993) ("[T]he suggestiveness . . . was compounded by the fact that the police informed [witness] prior to her identification of the [Defendant] that they had a suspect. . . . such coaching has long been recognized by the courts as an important factor in determining whether a pre-trial lineup procedure was impermissibly suggestive."); *Biggers*, 409 U.S. at 198 ("Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous.").

Given that the United States rightfully conceded the first prong of the test, the Court proceeds to analyze the second prong: "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Bredy*, 209 F.3d at 1195 (citation omitted).

**II.    Suppression is not warranted because the identification was sufficiently reliable.**

Mr. Calderon contends suppression is warranted because the identification procedure was so unnecessarily suggestive that it created a substantial likelihood of irreparable harm. In response, the United States argues that even though the identification procedure was unnecessarily suggestive, P.E.'s identification of Mr. Calderon should not be suppressed because it is nevertheless sufficiently reliable under the *Biggers* factors and considering the totality of the

9

circumstances. Defense counsel did not address the *Biggers* factors in the motion to suppress and elected not to file a Reply; however, defense counsel argued each factor at the suppression hearing.

**A.    The *Biggers* Factors weigh against suppressing P.E.'s identification.**

Recall, the Court considers five factors in determining whether an identification is reliable:

1. the opportunity of the witness to view the criminal at the time of the crime,
2. the witness' degree of attention,
3. the accuracy of the witness' prior description of the criminal,
4. the level of certainty demonstrated by the witness at the confrontation, and
5. the length of time between the crime and the confrontation.

*Biggers*, 409 U.S. at 199-200. Weighing these factors and considering the totality of the circumstances, the Court agrees with the United States that—despite the unnecessarily suggestive identification procedure used by APD officers—P.E.'s identification of Mr. Calderon is sufficiently reliable to be presented to the jury.

**1.    P.E. had the opportunity to view the robber at the time of the robbery.**

The first *Biggers* factor weighs in favor of the reliability of P.E.'s identification. As the United States correctly points out, P.E. "had a clear and close view of [the robber] during the robbery." **Doc. 43 at 6**. At the hearing, P.E. testified that the robber took off his disposable face mask before interacting with and threatening P.E. Furthermore, P.E. was within a couple feet of the robber during their interaction. The surveillance footage—although blurry—shows the robber was directly across the counter from P.E. during the robbery and shows the robber was not wearing a face mask when P.E. handed him money from the register.

Moreover, P.E. testified that he interacted with the robber for no less than a minute or two, which gave P.E. a reasonable opportunity to observe the robber. *See Archuleta v. Kerby*, 864 F.2d 709, 712 (10th Cir. 1989) (finding about two minutes gave the witnesses "ample opportunity" to view the criminal and collecting cases where observation for only a few seconds was held

sufficient). Finally, the surveillance and lapel camera footage show the gas station convenience store was well lit during and after the robbery.[15] *See United States v. Thurston*, 771 F.2d 449, 453 (10th Cir. 1985) (finding witness had an opportunity to observe the criminal in part because "the lighting conditions were adequate"); *United States v. Thody*, 978 F.2d 625, 629 (10th Cir. 1992) (finding witnesses observed the criminal in part because they were "within arm's reach of [the criminal] while complying with his instructions" and the "light was good"). Thus, the first factor favors the reliability of P.E.'s identification.

### 2. P.E. was attentive during his interaction with the robber.

The circumstances of the crime support a finding that P.E. was attentive during the interaction with the robber. P.E. testified that the robber threatened him with a handgun and told P.E. he would shoot him and that he was wanted for murder. The high stakes of the situation support a finding that P.E. was attentive during his interaction with the robber. *See United States v. Worku*, 800 F.3d 1195, 1205 (10th Cir. 2015) (upholding attentiveness of witnesses in part because "[e]ach [witness] described seeing [criminal] in circumstances that would have heightened their attention"). P.E. also had no difficulty providing APD officers with a detailed description of the robber immediately after the crime took place, which suggests the Defendant was attentive during his interaction with the robber. *See Kerby*, 864 F.2d at 712 (finding witnesses were attentive in part based on their "ability to recall a number of descriptive details" about the criminal). The Court finds this factor weighs in favor of the reliability of the identification.

---

[15] The Court acknowledges P.E. testified that the "lighting was poor" in the gas station but that he "still got a good look" at the robber. The Court finds the testimony that "the lighting was poor" to be contradicted by clear video evidence.

11

### 3. P.E.'s prior description of the robber accurately described the Defendant.

P.E.'s description of the robber to APD officers who arrived on scene at the Comanche Fuel Stop accurately described Mr. Calderon. P.E. consistently described the robber to APD officers as a Hispanic male in his mid-30's or early-40's, 5'-5'5," with tattoos over his eyes, and wearing a white shirt and blue jeans. The Court acknowledges that at the suppression hearing P.E. testified to a different weight—230-235 lbs. rather than 250-260 lbs.—to a different height—5'5"-5'6" rather than 5'-5'5"—and to the robber wearing a beanie hat rather than being bald. Nevertheless, this factor still weighs slightly in favor of the identification's reliability.

Defense counsel argued at the hearing that the Defendant is far shorter than 5'6"-5'7"—the height P.E. told the 911 dispatcher and testified to at the suppression hearing. The Court notes that the 911 call was not submitted into evidence for the purpose of the motion to suppress and that in the video recordings of the night of the robbery P.E. consistently tells APD officers the robber was 5'-5'5." Accordingly, P.E.'s testimony to a different height at the suppression hearing—nearly a year after the robbery—does not cut against the accuracy of P.E.'s description of the robber prior to the identification. Moreover, the Defendant failed to put on any evidence of the Defendant's actual height; and the Court cannot consider arguments made by counsel as evidence. Finally, defense counsel contended that, contrary to P.E.'s description of him, the Defendant does not have tattoos over *both* eyes—rather he has a tattoo over his left eye. Counsel also pointed out the Defendant has other distinctive tattoos on his face that P.E. never described. According to defense counsel, P.E. may have accurately described the robber, but P.E. did not accurately describe Mr. Calderon. The Court is not persuaded.

On the night of the robbery, P.E. consistently described the robber as a Hispanic male in his mid-30's or early-40's, with no hair, tattoos over his eyes, and wearing a white shirt and blue

jeans. The Defendant is a Hispanic male who falls within the estimated age range, who has face tattoos, including at least one tattoo that is clearly above his eyes, and the Defendant was identified while wearing a white shirt and blue jeans. Moreover, P.E. testified that he was able to clearly see the tattoos above the Defendant's eyes, which allowed him to clearly identify the Defendant as the robber. Accordingly, the Court finds that this factor—the accuracy of P.E.'s prior description of the criminal—weighs in favor of finding the identification sufficiently reliable.

   **4. P.E. demonstrated a high level of certainty when identifying Mr. Calderon.**

P.E.'s certainty when identifying Mr. Calderon as the robber weighs in favor of denying the motion to suppress. At the suppression hearing, P.E. testified that at the time of identification he was "fairly certain" that Mr. Calderon was the robber. Additionally, based on the lapel camera recording and its transcript, P.E. did not hesitate and unequivocally identified Mr. Calderon:[16]

| | |
|---|---|
| **Officer Hoffman:** | All right, so the male subject's going to be just up here and look in the parking lot and see if you recognize any of the cars. |
| … | |
| **P.E.:** | That's him. |
| **Officer Hoffman:** | That's him? |
| **P.E.:** | That's him. |
| **Officer Hoffman:** | [Inaudible] 727, that's a positive ID. |

P.E. did not express any doubt that Mr. Calderon was the man who robbed the Comanche Fuel Stop; thus, the level of certainty demonstrated by the witness weighs in favor of finding P.E.'s identification sufficiently reliable. *See Bredy*, 209 F.3d at 1197 (finding identification reliable because show-up witnesses "were unequivocal when they initially identified Defendant as the robber"). At the suppression hearing, defense counsel argued that unspecified scientific studies have found that there is no correlation between the certainty of a witness's identification and the

---

[16] *See* Government Exhibit 4 at 8:40.

identification's accuracy. This argument appears to challenge whether the *Biggers* factors are appropriate at all in light of scientific studies. The Court cannot entertain this argument. The Supreme Court and the Tenth Circuit have instructed district courts to weigh a witness's level of certainty at the time of the identification when determining if an identification is sufficiently reliable. The Court has done just that and concludes P.E.'s level of certainty favors the reliability of his identification.

### 5. A short period of time elapsed between crime and identification of Mr. Calderon.

At the suppression hearing, defense counsel conceded this factor weighs against suppression. The Court agrees. According to P.E.'s testimony, P.E. identified the Defendant a little after midnight on December 4, 2021—less than an hour after the robbery. The short period of time between when the crime occurred and when P.E. identified Mr. Calderon favors a finding that P.E.'s identification is sufficiently reliable. *See Thody*, 978 F.2d at 629 (upholding identification one week after robbery); *Thurston*, 771 F.2d at 453 (upholding identification four hours after crime); *Archuleta*, 864 F.2d at 712 (upholding identification thirty minutes after crime and noting that thirty minutes is "shorter than the seven months in *Neil* and the two days in *Manson*, which the Supreme Court held were not too long"); *Worku*, 800 F.3d at 1206 (upholding identification thirty years later based on extraordinary circumstances of the case).

## CONCLUSION

While the Court agrees with Defendant that the identification procedure utilized by APD was unnecessarily suggestive, the Court nevertheless concludes that suppression is not warranted in this case because under the *Biggers* factors and in light of the totality of the circumstances, P.E.'s identification of the Defendant is sufficiently reliable to be presented to the jury. In other words, the Defendant failed to show there is "a very substantial likelihood of irreparable misidentification." *Snow*, 474 F.3d at 720. Defendant's Motion to Suppress (**Doc. 42**) is **DENIED.**

**IT IS SO ORDERED.**

_____
CHIEF UNITED STATES DISTRICT JUDGE